**UNITED STATES of America,**

v.

**Jamie M. SNYDER, Defendant.**

**No. 5:99CR–528HGMGJD.**

United States District Court,
N.D. New York.

Feb. 20, 2002.

Hon. Joseph A. Pavone, United States Attorney for the Northern District of New York, Attorney for the Government, Syracuse, NY, Brenda K. Sannes, AUSA, of Counsel.

Hon. Alexander Bunin, Federal Public Defender Attorney for the Defendant, Syracuse, NY, James F. Greenwald, AFPD, of Counsel.

## MEMORANDUM—DECISION AND ORDER

MUNSON, Senior District Judge.

Currently before the court is a Petition for Warrant of Summons for Offender Under Supervision (Probation Form 12C) recommending revocation of the term of supervision for defendant Jamie M. Snyder.[1]

## BACKGROUND

On July 6, 2000, defendant was sentenced by this court to three years of probation after pleading guilty to a charge of Possession of an Unregistered Firearm in violation of 26 U.S.C. § 5861(d). In addition to the standard conditions of probation, the court imposed the following additional special conditions: (1) defendant shall serve six months of home detention; and (2) defendant shall submit to drug/alcohol testing and treatment as directed by the Probation Office of the United States District Court for the Northern District of New York ("Probation Office").

On July 12, 2000, defendant reviewed the conditions of his probation with Mark Walker, Senior United States Probation Officer ("P.O. Walker"). Defendant acknowledged that he fully understood and

---

1. The U.S. Probation Office initially filed a Petition on February 20, 2001. An Amended Petition was filed on June 6, 2001, containing additional probation violations. A Second Amended Petition was filed on August 28, 2001, containing additional probation violations occurring subsequent to the original Amended Petition. For purposes of evaluating the Probation Office's recommendation of revocation of the term of supervision, the court will examine the alleged probation violations contained in the Second Amended Petition.

would comply with the conditions. P.O. Walker also provided defendant with a copy of the conditions for his records.

On July 17, 2000, defendant commenced his term of home detention and he remained under monitoring until January 17, 2001. During this period of home detention, defendant's compliance with the electronic monitoring program was marginal. On several occasions, defendant failed to answer his telephone during the time that he was required to be at home. Additionally, defendant cut off his electronic transmitter at 12:02 a.m. on January 17, 2001 without permission.

As another special condition to his probation, defendant was required to submit to drug/alcohol testing as directed by the Probation Office. Defendant failed to report for required drug testing on several occasions. As a sanction for these violations and in addition to continued urinalysis testing, the Probation Office began testing defendant using the PharmChek sweat patch ("sweat patch") on October 20, 2000. The Probation Office uses sweat patch testing as either a sanction or as an alternative to urinalysis in situations where an offender fails to provide a urine specimen.

On November 3, 2000, the Probation Office received notification of a positive test result for cocaine on a sweat patch. On November 8, 2000, P.O. Walker and Timothy Keohane, Supervising United States Probation Officer ("Supervising P.O. Keohane"), questioned defendant about his drug use during an Administrative Conference. Defendant denied using cocaine or any other illegal drug and admitted only to occasional alcohol use. During the Administrative Conference, the Probation Office referred defendant to Syracuse Behavioral Healthcare ("SBH") for a substance abuse evaluation.

On November 20, 2000, defendant commenced outpatient substance abuse treatment at SBH. Defendant failed to report for treatment sessions on November 28, 2000 and December 22, 2000. As a result, his treatment level was increased to intensive outpatient, resulting in daily treatment sessions.

On January 3, 2001, defendant and his father, Darren Francisco, met with P.O. Walker and members of the SBH staff for a second Administrative Conference. During the discussion, defendant refused to admit that he had used cocaine during the course of his probation.

On January 8, 2001, defendant met with P.O. Walker and members of the SBH staff for a treatment meeting. SBH counselors advised defendant that if he admitted using drugs, they would refer him to an inpatient facility. Defendant refused to do so, and SBH terminated defendant's treatment because they were unable to treat him without an admission of drug use.

On July 28, 2001, defendant failed to report for a drug test in a timely manner and was subsequently unable to provide a urine specimen. On August 2, 2001, defendant produced a urine specimen to make up for the previous failure. On August 15, 2001, the Probation Office received word that the results of the urinalysis were positive for marijuana. On August 17, 2001, defendant was confronted with the results of the test and he admitted using marijuana at a rock concert during the end of July.

In addition to the specific instances discussed above, defendant has violated the terms of his probation on numerous other occasions. Since defendant was sentenced by this court on July 6, 2000, he has failed to report for a drug test on five different occasions, in violation of Special Condition

No. 2.[2] Additionally, defendant submitted a positive sweat patch to the Probation Office on a total of eight different occasions, in violation of Standard Condition No. 7.[3]

## DISCUSSION

I. *Standard for Revocation of a Term of Supervised Release*

Under Title 18 of the United States Code, Section 383(e)(3), the court may revoke a term of supervised release if it finds by a preponderance of the evidence that the defendant violated a condition of the supervised release.

II *Violations*

A. *Number 1—Submission of a Positive Sweat Patch*

As previously stated, defendant submitted eight sweat patches that were positive for cocaine, in violation of Standard Condition No. 7. Prior to a Violation Hearing scheduled for April 9, 2001, defendant challenged the use of sweat patches for drug testing purposes. Defendant based his challenge on a similar issue raised in *United States v. Stumpf,* 54 F.Supp.2d 972 (D.Nev. 1999).

In *Stumpf,* defendants filed a motion in limine to exclude the admissibility of sweat patch test results from proceedings to revoke their supervised release. Judge Pro held that drug testing by means of the sweat patch utilized by the United States Department of Probation was a reliable scientific method of testing for the presence of controlled substances.

On June 11, 2001 through June 13, 2001, this court held an evidentiary hearing to examine the sweat patch and its use in the present case. The court heard testimony from defendant, P.O. Walker, Supervising P.O. Keohane, Edward Cone, Ph.D., and Frederick Smith, Ph.D. During the course of the hearing, documents obtained by defendant pursuant to a subpoena duces tecum served on non-party PharmChem Laboratories Inc. ("PharmChem")[4] were discussed by the witnesses and admitted into evidence. Initially, PharmChem resisted complying with the subpoena without promises from counsel that all of its responses would be kept strictly confidential. In order to avoid unnecessary delay in preparing for the hearing, counsel agreed to an Order requiring that the dissemination of the documents would be restricted until such time as the court could determine whether or not the documents should remain confidential. At the close of the hearing, defendant requested a determination from the court that none of the subpoenaed documents should be kept

---

**2.** Special Condition No. 2 states "[defendant] shall submit to alcohol and drug testing as directed by the probation officer."

Defendant failed to report for a drug test on:
  July 15, 2000
  September 6, 2000
  October 15, 2000
  November 14, 2000
  November 11, 2001

**3.** Standard Condition No. 7 states "[defendant] shall not use any narcotic or controlled substance . . ."

Defendant submitted a positive sweat patch on:

  October 20, 2000—October 25, 2000
  October 25, 2000—November 3, 2000
  November 3, 2000—November 8, 2000
  November 8, 2000—November 15, 2000
  November 17, 2000—November 22, 2000
  November 22, 2000—November 30, 2000
  November 30, 2000—December 7, 2000
  December 11, 2000—December 18, 2000
  NOTE: date ranges represent the date that the patch was applied and the date that the patch was removed

**4.** PharmChem is represented in this matter by Timothy J. Cappuccilli, Esq. of Menter, Rudin & Trivelpiece, P.C., Syracuse, New York.

confidential. The court will address this issue at the conclusion of its analysis of the violations.

### 1. *Sweat Patch Procedures*

During mid–1999, the Probation Office began using the sweat patch, produced by PharmChem, for drug testing purposes. The decision to use the sweat patch was made because of inherent flaws in urinalysis testing. When testing for cocaine, urinalysis is only able to detect cocaine during the 72–hour time period that it will normally remain in an offender's system. Utilizing the sweat patch allows the Probation Office to expand its testing window to beyond the 72 hours that urinalysis offers.

The sweat patch features an absorbent pad sandwiched between the skin and an outer non-occlusive membrane that allows water vapor to pass through. The sweat patch is affixed to an offender's skin using a tamper-evident adhesive backing on the membrane. Once the sweat patch is affixed, the outer layer of the absorbent pad adheres to the skin in an unusual way, forming a bond with the skin so it stays on and will not come off. If the absorbent patch is removed from the skin, it cannot be reattached. After the absorbent pad bonds with the skin, it becomes a collection device. The offender's sweat wets the pad, the water in the sweat eventually evaporates through the non-occlusive membrane, and any drugs remain in the absorbent pad. Once the sweat patch is removed from the offender, it is returned to PharmChem for analysis.

Members of the Probation Office, including P.O. Walker, were taught about the sweat patch and the applicable drug testing procedures by Senior Probation Officer Matthew Brown. The training consisted of watching a video produced by PharmChem and a discussion of the Probation Office's procedures for applying the sweat patch.

The Probation Office has a specific drug testing room that is used to apply and remove sweat patches. The room remains off limits to any unauthorized personnel, ensuring the offender's privacy. Additionally, controlled substances are prohibited from entering the controlled environment.

Prior to affixing a sweat patch to an individual, a probation officer reviews a notice stating the testing procedures with the offender and makes recommendations on how to successfully wear the sweat patch. After reviewing the notice, the offender signs and dates it, and the probation officer subsequently does the same.

Next, the probation officer completes the form for the sweat patch. Each sweat patch has a unique bar code identification number that is specific to each test. This identification number is written on the form, along with the probation officer's name, the offender's name, and the date on which the sweat patch is applied. Once the probation officer completes the form, the offender initials it.

Once the paperwork is completed, the probation officer puts on a pair of single-use latex gloves and instructs the offender to expose the area where the sweat patch is going to be applied. Typically, the sweat patch is applied to the upper arm. Prior to application of the sweat patch, the entire area is wiped down with alcohol wipes. The recommended minimum number of wipes is two, but P.O. Walker testified that he would typically use between four and five wipes, doubling that number if the wipes were small.

After the entire area has been wiped and allowed to dry for approximately four or five seconds, the probation officer removes the sweat patch from its packaging and places it on the offender's area of skin

previously wiped. If any of the corners of the patch are not completely adhered to the offender's skin, the probation officer uses his hand, still wearing the latex gloves, to make sure that the entire area is completely sealed.

When the offender returns to the Probation Office so that the sweat patch can be removed, there is a second part of the form that the probation officer fills out. The removal date is filled in and it is initialed by both the probation officer and offender. An additional section of the form allows the probation officer to include use information, such as whether the offender completed the testing period, whether the sweat patch fell off, whether there are any indications that the sweat patch was tampered with, or whether the pad itself was exposed to air or moisture. The final section allows the probation officer to describe any medications that the offender is taking. Once the second part of the form is completed, the offender signs the certification and consent, and the probation officer signs the certification. The offender and probation officer also initial the chain of custody strip, which is located under the security seal.

Following the completion of the removal paperwork, the probation officer puts on a pair of single-use latex gloves and proceeds to remove the sweat patch from the offender. First, the probation officer removes the adhesion strip and exposes the absorbent pad, not allowing the offender to touch the strip or pad with their bare hands. Then, the probation officer uses a pair of single-use tweezers to remove the testing pad from the adhesion strip and places it into a small sealable bag.

The sweat patch form includes two bar code labels. One of the bar code labels is placed across the seal of the small bag. The small bag is then placed inside a larger sealable bag along with the complet-ed sweat patch form. The larger bag is sealed and a bar code label is placed across the seal, as well as a security seal that maintains the integrity of the test. The larger bag is then placed in a pre-stamped manilla envelope and it is mailed to the PharmChem testing facility for analysis.

2. *Sweat Patch Reliability*

■ After reviewing the testimony of the June 2001 evidentiary hearing and the admitted exhibits, the court has determined that the sweat patch is generally reliable for drug testing purposes. However, the sweat patch is not perfect and the potential for erroneous results clearly exists.

The testimony of Drs. Cone and Smith supports the court's conclusion that the sweat patch is susceptible to outside environmental contamination in limited situations. In order for outside environmental contamination to occur, the offender must be exposed to a source of drugs for contamination. Potential sources of drugs for contamination are plentiful. Several types of drugs, including cocaine, are found on paper currency. Although drugs on currency are difficult to transfer to the skin, they can be transferred if the skin is moist. Once the drugs are transferred to an offender's skin, such as a hand, they are easily transferred to the exterior of the sweat patch because touching the patch with one's hand is a natural reaction to the presence of a foreign material on the body. Transfer can also occur if an offender intentionally presses on the sweat patch to keep it adhered to the skin.

There is also the possibility of contamination from the clothing of an offender exposed to drugs. Reports indicate that clothing retains drugs, such as cocaine metabolite. If an offender wears contaminated clothing over the area above the sweat

patch, the drugs could be transferred to the exterior of a patch moistened by sweat.

If the offender is exposed to a source of the drugs for contamination, the drugs may penetrate the sweat patch from the outside through the non-occlusive membrane. In order for this to occur, the drugs must be part of a basic solution (i.e., a solution with a pH greater than 7) that penetrates the membrane. A combination of drugs, an additional chemical and water can create such a solution. If the additional chemical is basic, the resulting basic solution could penetrate the exterior of the sweat patch and wet the absorbent pad. Once the water evaporates through the non-occlusive membrane, the drugs will remain in the absorbent pad, despite the fact that they originated from outside of the sweat patch and not from within the offender's body.

A potential source of the water required to create a basic solution is profuse sweating. When an offender sweats profusely, the absorbent pad on the inside of the sweat patch may become saturated, allowing the outside of the patch to also become moistened with sweat. This moisture, combined with drugs and an additional chemical present on the exterior of the patch, can create a basic solution that can penetrate the non-occlusive membrane.

There are several ways that an additional basic chemical can be introduced onto the exterior of the patch. Common cleaning products such as Dial soap or Windex are basic. They could be placed on the sweat patch by a variety of means, including showering or contact with contaminated hands. Additionally, crack cocaine is made with sodium bicarbonate. During production, some of the bicarbonate can remain with the crack cocaine, making it basic. Once the crack cocaine is combined with water, the solution becomes basic without the introduction of an additional

chemical because the crack cocaine is already basic.

In addition to the testimony of the experts, PharmChem's documents detailing its internal testing support the conclusion that the sweat patch is susceptible to outside environmental contamination in limited situations. Exhibit I describes an experiment performed by PharmChem where it affixed sweat patches to glass plates and then applied basic, neutral and acidic cocaine solutions to the exterior of the patches. The results of the experiment showed that cocaine was found in the absorbent pads of the sweat patches treated with the basic solution.

On the basis of the testimony of Drs. Cone and Smith, as well as the PharmChem documents admitted into evidence, the court concludes that the sweat patch is susceptible to outside contamination in situations where the exterior of the patch is exposed to a basic solution containing drugs. Therefore, although the sweat patch is generally reliable, it cannot be relied upon in situations where it is shown that the possibility of exterior contamination exists due to exposure to a basic solution containing drugs.

### 3. Sweat Patch Contamination in the Present Case

For the past three years, defendant resided in a house on West Ellis Street in East Syracuse, New York owned by his mother. In June of 2000, defendant's mother moved back into the house to live with defendant and remained there until the middle of December 2000, when she primarily stayed with a boyfriend in Oswego, New York. Defendant's mother is a crack cocaine user. Although she never smoked the crack cocaine in front of defendant, defendant often returned home from work to find his mother high and in the company of friends. When defendant con-

fronted his mother about her drug use, she admitted smoking crack cocaine, but told him that she can do what she would like and it is none of his business.

During the relevant time period of July through December of 2000, defendant worked at McLane's Northeast, a distribution company. Defendant worked ten to twelve-hour days manually loading trucks. Defendant described the workload as heavy, leading to continuous sweating while on the job. During the summertime, defendant would wear the least amount of clothing as possible, usually shorts and a t-shirt. During the colder months, defendant would arrive to work wearing sweatpants and a sleeveless undershirt. Once he began working, defendant would remove the sweatpants and wear the mesh shorts that he had on underneath.

The profuse sweating lead to problems for defendant and his sweat patches. On a couple of occasions, the sweat patches started peeling back. On other occasions, the area where the sweat patch was affixed would become uncomfortable and itchy. Defendant would rub the patch while at work and at home in an attempt to relieve the itchy sensation.

■ On the basis of defendant's testimony, the court concludes that defendant's positive sweat patch results fall within the limited exception to the general reliability of the sweat patch. During the time period of his positive test results, defendant resided with his mother, an admitted crack cocaine user that smoked with her friends in her house. Defendant also worked in an occupation where he sweated profusely on a daily basis and often rubbed his sweat patch in order to relieve the discomfort. Recognizing these facts, the court concludes that defendant's exposure to drugs in his environment and profuse sweating is a sufficient basis for rejecting the reliability of the sweat patch in this specific in-

stance. A preponderance of the evidence does not demonstrate that defendant violated Standard Condition No. 7 by submitting a positive sweat patch.

**B.** *Number 2—Association with Persons Engaged in Criminal Activity or Felons*

The court finds by a preponderance of the evidence that defendant violated Standard Condition No. 7 by associating with persons engaged in criminal activity and associating with persons convicted of a felony, without permission of a probation officer. As previously discussed, defendant resided with his mother, an admitted crack cocaine user. Additionally, on February 6, 2001, defendant associated with his co-defendant and felon, Joseph Gilkey. On that day, defendant and Mr. Gilkey shared a ride to the Probation Office without receiving permission from a probation officer. On March 1, 2001, when directly questioned by this court about his association with Mr. Gilkey, defendant denied the allegation. However, during the June 2001 evidentiary hearing, defendant admitted to the court that he had lied and that he had associated with Mr. Gilkey in violation of Standard Condition No. 7.

**C.** *Number 3—Submission to Alcohol and Drug Testing*

The court finds by a preponderance of the evidence that defendant violated Standard Condition No. 2 by failing to submit to alcohol and drug testing as directed by his probation officer. As previously discussed, defendant has failed to report for drug testing on five different occasions.

**D.** *Number 4—Submission to Substance Abuse Evaluation and Complete Treatment*

The court finds by a preponderance of the evidence that defendant violated Spe-

cial Condition No. 3 by failing to submit to a substance abuse evaluation and complete treatment as directed by his probation officer. As previously discussed, on January 8, 2001, SBH terminated defendant's substance abuse treatment prior to completion because of his failure to admit drug use.

### E. *Number 5—Submission of a Positive Urine Test*

The court finds by a preponderance of the evidence that defendant violated Standard Condition No. 7, prohibiting use of any narcotic or controlled substance. As previously discussed, on August 2, 2001, defendant submitted a positive urine test for marijuana. When confronted with the results of the test, defendant admitted to using marijuana at a rock concert.

### III. *Confidentiality of the Subpoenaed Documents*

As previously mentioned, on April 25, 2001, this court issued an Order prohibiting, with certain exceptions, disclosure of documents produced by PharmChem pursuant to a subpoena duces tecum. At the close of the June 2001 evidentiary hearing, defendant requested a determination that none of the subpoenaed documents should be kept confidential and PharmChem requested that this court prohibit further dissemination of the subpoenaed documents. The government did not have a position on this issue.

### A. *Public Access to Judicial Documents Analysis*

■ The common law right of public access to judicial documents is said to predate the Constitution. *See United States v. Amodeo,* 44 F.3d 141, 145 (2d Cir.1995) (*"Amodeo I"*). Recognizing this longstanding right, the Supreme Court has stated:

It is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents. In contrast to the English practice, ... American decisions generally do not condition enforcement of this right on a proprietary interest in the document or upon a need for it as evidence in a lawsuit.

*Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 597–98, 98 S.Ct. 1306, 1312, 55 L.Ed.2d 570 (1978). In fact, not only is there a common law right to public access, there is a presumption in favor of public access to judicial documents. *See Securities and Exch. Comm'n v. Thestreet.com,* 273 F.3d 222, 231 (2d Cir.2001). However, despite this presumption, the fact that a document is a judicial record does not mean that access to it cannot be restricted. The Supreme Court has said that:

[i]t is uncontested ... that the right to inspect and copy judicial records is not absolute. Every court has supervisory power over its own records and files, and access has been denied where court files might have become a vehicle for improper purposes.

*Id.* at 598, 98 S.Ct. at 1312. In order to determine whether or not public access is appropriate, the task of the courts is to "weigh the interests advanced by the parties in light of the public interest and the duty of the courts." *Id.* at 602, 98 S.Ct. at 1314.

■ The first step to determining whether or not public access is appropriate requires the court to face the issue of whether a document may be classified as a "judicial document," and is therefore accessible to the public. The Second Circuit has stated that:

[T]he mere filing of a paper or document with the court is insufficient to render that paper a judicial document subject to

the right of public access. [T]he item filed must be relevant to the performance of the judicial function and useful in the judicial process in order for it to be designated a judicial document. *Amodeo I,* 44 F.3d at 145.

Once the court deems a document to be a judicial document, the weight of the presumption of public access must be determined by evaluating "the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts." *United States v. Amodeo,* 71 F.3d 1044, 1049 (2d Cir.1995) ("*Amodeo II* "). Typically, a judicial document will "fall somewhere on a continuum from matters that directly affect an adjudication to matters that come within a court's purview solely to insure their irrelevance." *Id.* As one moves along the continuum, the weight of the presumption declines. Therefore, the presumption is strong where a judicial document directly affects an adjudication, but where a document only plays a negligible role in the performance of Article III duties, "the weight of the presumption is low and amounts only to a little more than a prediction of public access absent a countervailing reason." *Id.* at 1049–50.

After the weight of the presumption of public access has been determined, the court must balance competing considerations against it. *Id.* at 1050. The Second Circuit has identified two countervailing factors: (1) the danger of impairing law enforcement or judicial efficiency, and (2) the privacy interests of those resisting disclosure. *Id.* The first factor recognizes that unlimited access, while perhaps aiding the monitoring of the courts, might adversely affect law enforcement or judicial performance. *Id.* Individuals with law enforcement responsibilities may be reliant upon the cooperation of persons that may want or need confidentiality. *Id.* If confidentiality cannot be assured, the necessary cooperation may not be forthcoming. *Id.* Additionally, if public access to the documents at issue is likely to materially impair a court's performance of Article III functions, this must be considered as a danger of impairing judicial efficiency. *Id.*

The second factor pertains to the privacy interest of the party resisting disclosure. "[T]he privacy interests of innocent third parties ... should weigh heavily in a court's balancing equation." *Gardner v. Newsday, Inc. (In re Newsday, Inc.),* 895 F.2d 74, 79–80 (2d Cir.1990) (quoting *In re New York Times,* 828 F.2d 110, 116 (2d Cir.1987)). In determining the weight given to an assertion of privacy, a court should first consider the degree to which the subject matter is traditionally considered private rather than public. *Amodeo II,* 71 F.3d at 1051. Subsequently, the nature and degree of potential injury to the party must also be weighed, requiring consideration not only of the subject and sensitivity of the information, but also of the intended use of the information by the person seeking access. *Id.*

### B. *Application of the Analysis to the Present Case*

In the present case, the subpoenaed documents pertain to tests performed or commissioned by PharmChem to determine the susceptibility of the sweat patch to false positive results. The documents were provided to Drs. Cone and Smith for their review. During testimony made during the June 2001 evidentiary hearing, each of the doctors discussed the specific experiments detailed in the documents and their opinions on the scientific conclusions. Additionally, Defense Exhibits C, F, G, H, I, J and K were all admitted into evidence during the hearing.

■ The court relied heavily upon the testimony of the doctors and admitted exhibits during its analysis of the reliability of the sweat patch. As such, the subpoenaed documents were relevant to the performance of the judicial function and useful to the court in its review of the evidence presented. Therefore, the court finds that the subpoenaed documents are judicial documents for public accessibility purposes.

■ A presumption in favor of public access to the subpoenaed documents now exists. The court must now evaluate the role that the documents played in the present case and the resultant value of the documents to those monitoring the federal courts. As previously noted, the court relied heavily upon the subpoenaed documents admitted into evidence and the testimony of the doctors based, in part, on their review of the documents. Therefore, the contents of the subpoenaed documents directly affected the findings of this court in the present matter and access to these documents would be important to those monitoring the courts for a greater understanding of the court's findings. Recognizing these facts, the presumption in favor of public access can be described as strong.

■ The court must now balance the strong presumption of disclosure with the competing considerations. There is little likelihood of danger of impairing law enforcement or judicial efficiency in the present case. It is unlikely that access to the subpoenaed documents will prevent cooperation of others with law enforcement officials in the future. Additionally, public access to the documents is unlikely to materially impair a court's performance of subsequent Article III functions. Therefore, the court finds that the strong presumption of disclosure is not outweighed by the first countervailing factor.

■ The second competing consideration of third-party privacy is more applicable in the present case. PharmChem claims that the subpoenaed documents are confidential and proprietary, and were disclosed solely for the purpose of the June 2001 evidentiary hearing. PharmChem further states that it has ongoing research and development projects to test and enhance its existing products and services in order to better serve its clients, remain competitive, continue to be an industry leader, and try to develop new products and services. In order to preserve the confidential nature of these research and development efforts, PharmChem claims to have limited the number of persons having knowledge of these efforts and securely maintained any related documents. PharmChem's concern is that its competitors will seize the information contained in the documents and utilize it against PharmChem by developing competing products, thereby causing significant harm and prejudice.

In order to evaluate the effect of disclosure upon PharmChem's privacy interest, the nature and degree of potential injury must be examined. As previously stated, PharmChem claims that it will be significantly harmed by public access to the confidential and proprietary information contained in the subpoenaed documents because it would assist a competitor with the development of a competing product. However, Dr. Smith's testimony rejects such a claim. After reviewing the documents, Dr. Smith found that they did not contain any design information and did not discuss any experiments unique to PharmChem's testing program. Additionally, Dr. Smith explained that the findings that have been published in the general literature includes the scope of PharmChem's experimentation, as well as additional testing. After considering the likelihood of potential injury to PharmChem's

privacy interest, the court finds that the strong presumption of disclosure is not outweighed by the second countervailing factor.

PharmChem has failed to satisfy its burden of overcoming the strong presumption in favor of public access to the judicial documents. Therefore, the court finds that any confidentiality provision previously imposed on the subpoenaed documents is no longer appropriate and that public access to the documents may exist.

## CONCLUSION

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED**, that the term of supervision is **REVOKED**. It is further

**ORDERED**, that the April 25, 2001 Order imposing confidentiality provisions upon all documents submitted by non-party PharmChem in compliance with the subpoena duces tecum is **VACATED**. It is further

**ORDERED**, that parties are directed to appear before the court for sentencing on February 22, 2002 at 2 p.m. in Syracuse, New York.

**IT IS SO ORDERED.**