**Bruce LYTLE, Plaintiff,**

v.

**JPMORGAN CHASE, Defendant.**

**No. 08 Civ. 9503(DAB)(JLC).**

United States District Court,
S.D. New York.

Sept. 1, 2011.

618

Bruce Lytle, Jamaica, NY, pro se.

Tara A. Griffin, J.P. Morgan Chase & Co., Legal Department, Thomas J. Cahill, Zoe Eva Jasper, Satterlee Stephens Burke & Burke LLP, New York, NY, for Defendant.

### MEMORANDUM ORDER

JAMES L. COTT, United States Magistrate Judge.

On April 22, 2011, Defendant JPMorgan Chase ("JPMC") filed a redacted version of its summary judgment papers and provided the Court with an unredacted version of the papers for *in camera* review. Having reviewed JPMC's submission, I ordered JPMC on April 28, 2011 to show cause why the redacted version of its papers should not be unsealed and directed it to make such showing by submitting, among other things, a memorandum of law setting forth the legal authority that supports the sealing of the records and information that it had redacted. Additionally,

at a hearing held on May 13, 2011, I ordered JPMC to present its proposal concerning the information it believes should be redacted from the papers submitted by *pro se* Plaintiff, Bruce Lytle ("Lytle"), in opposition to JPMC's summary judgment motion. Having carefully considered all of these submissions, I conclude that all documents in support of or in opposition to JPMC's motion for summary judgment shall be unsealed in their entirety, except for one document containing certain personal information relating to Lytle, parts of which shall remain redacted pursuant to Rule 5.2 of the Federal Rules of Civil Procedure.

## I. BACKGROUND

In this employment discrimination action, Lytle, an African–American male and observant Jehovah's Witness, alleges that JPMC terminated him on account of his race, color, and religion in violation of Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law, and the New York City Human Rights Law. He further alleges that JPMC subjected him to a hostile work environment, failed to provide him with a requested religious accommodation, and unlawfully retaliated against him after he voiced complaints within JPMC regarding the alleged discriminatory treatment. On April 21, 2011, JPMC, with the permission of the Court, filed its papers in support of its motion for summary judgment under seal, in a form that redacted all information that JPMC claimed should not be placed on the public record. Dkt. Nos. 43–52. Lytle submitted

his papers in opposition to the summary judgment motion on May 6, 2011,[1] and supplemented these papers with two additional submissions, a letter to the Court dated June 15, 2011, styled as "Summary Judgment—Supplemental Papers" and a submission bearing the same name dated June 26, 2011.[2] JPMC filed its reply papers in redacted form on July 8, 2011. Dkt. Nos. 71–75. The issue addressed here is whether any of the records or information in the parties' summary judgment submissions shall remain under seal. I address this issue now, in advance of any adjudication of the summary judgment motion, because the Second Circuit has emphasized the importance of determining public access issues of this kind promptly. *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 126 (2d Cir.2006).

In support of its sealing request, JPMC has filed a memorandum of law, along with various affidavits from individuals with personal knowledge of the facts at issue, which identify with particularity the precise records and information that JPMC maintains should be kept under seal and attempt to demonstrate the particular need for sealing each piece of information. *See* Memorandum of Law in Support of an Order Sealing Certain Records and Information dated May 6, 2011 ("Def.'s Mem.") (Dkt. No. 55); Affidavit of Magaly Denis–Roman in Support of an Order Sealing Certain Records and Information dated May 6, 2011 ("Denis–Roman Aff.") (Dkt. No. 56); Affidavit of Brenda McKee in Support of an Order Sealing Certain Records and Information dated May 6, 2011

---

1. Lytle's opposition papers include three submissions: a document entitled "Summary Judgment" and two documents, each of which Lytle refers to as "Evidence Booklet." All of these documents are undated but were received by the Court on May 6, 2011. These papers have been submitted in unredacted form to chambers and are currently undocketed.

2. Although the summary judgment motion is now fully submitted, Lytle has also submitted, in violation of the briefing schedule set forth in the Court's Order dated June 17, 2011 (Dkt. No. 67), two sur-replies—one dated July 13, 2011 and another July 21, 2011—which JPMC contends the Court should not consider.

("McKee Aff.") (Dkt. No. 57); and Affidavit of Zoe Jasper in Support of an Order Sealing Certain Records and Information dated May 6, 2011 ("Jasper Aff.") (Dkt.Nos.58–59). Finally, on July 1, 2011, JPMC presented its proposal concerning the information in Lytle's opposition papers that it believes should be sealed. Letter to the Court dated July 1, 2011 ("Def.'s July 1, 2011 Letter").

Though Lytle has not responded specifically to the arguments in JPMC's memorandum of law, by letter dated April 7, 2011, he objected to the filing of any materials under seal, Letter dated April 7, 2011 ("Pl.'s April 7, 2011 Letter"), and essentially reiterated that position during a hearing on this issue on May 13, 2011.

## II. DISCUSSION

JPMC seeks to maintain six categories of information under seal.[3] The categories are as follows: (1) the names of three current JPMC employees and one former JPMC employee whose conduct was reviewed in connection with JPMC's internal investigation of Lytle's allegations and against whom JPMC ultimately took disciplinary action; (2) the names of persons who provided confidential information or otherwise assisted JPMC in connection with its internal investigation of Lytle's allegations; (3) the names and email addresses of individuals who failed to timely comply with a requirement that all JPMC employees affirm the company's Code of Conduct (the "Code") as a condition of

continued employment; (4) an internal Chase URL address accessible only by Chase employees for purposes of affirming the Code, and a telephone inquiry number available to Chase employees who had questions about affirming it; (5) personal information pertaining to Lytle; and (6) the identity of a JPMC employee who Lytle alleges received disparate treatment in connection with a work schedule modification. Def.'s Mem. at 4–5; Def.'s July 1, 2011 Letter at 1–2.

JPMC generally contends that the privacy interests implicated by the information in each of these categories rebut the "relatively weak" presumption of access to this information and therefore, JPMC argues, the Court should permit JPMC to maintain this information under seal. Def.'s Mem. at 4.[4] Lytle opposes the sealing of any information from the public. Pl.'s April 7, 2011 Letter at 2–3. And, by letter dated August 4, 2011, Lytle recently reiterated this position, asserting that the sealing of any of the information in the parties' summary judgment filings is inconsistent with the "fundamental laws and principles" of his religion. Letter dated August 4.2011 at 2 ("Pl.'s August 4, 2011 Letter").

### A. Legal Standard For Sealing
#### 1. The Presumptive Right of Public Access

There is a long-established common law right of public access to "judicial

3. JPMC originally sought to maintain information regarding JPMC's temporary restriction on Lytle's access to certain facilities—an action that Lytle claims was retaliatory—under seal. However, it no longer seeks to do so. Def.'s Mem. at 3 ("While the redactions contained in JPMC's initial public filing of its summary judgment motion were somewhat broader in scope, in the interests of minimizing the burden on the Court, JPMC is now limiting its request for a sealing order request

to the specified material identified in the Jasper Affidavit.").

4. JPMC also requested, at the May 13, 2011 hearing, that when the Court issues its report and recommendation regarding the summary judgment motion, it do so without using any of the names or other information JPMC seeks to redact, though it conceded at the hearing that it had no authority to support this request. May 13, 2011 Transcript ("Tr.") 24:19–25:5.

documents"—documents filed with a court that are " 'relevant to the performance of the judicial function and useful in the judicial process.' " *Lugosch,* 435 F.3d at 119 (quoting *United States v. Amodeo,* 44 F.3d 141, 145 (2d Cir.1995) ("*Amodeo I* ")). It is also "well established that the public and the press have a 'qualified First Amendment right to attend judicial proceedings and to access certain judicial documents.' " *Id.* at 120 (quoting *Hartford Courant Co. v. Pellegrino,* 380 F.3d 83, 91 (2d Cir. 2004)). "[D]ocuments submitted to a court for its consideration in a summary judgment motion are—as a matter of law—judicial documents to which a strong presumption of access attaches, under both the common law and the First Amendment." *Id.* at 121.[5] The burden of demonstrating that such documents should be sealed rests on the party seeking such action—here, JPMC. *See, e.g., DiRussa v. Dean Witter Reynolds Inc.,* 121 F.3d 818, 826 (2d Cir.1997) (citations omitted). Additionally, the Supreme Court has explained that "the decision as to access [to judicial records] is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case." *Nixon v. Warner Commc'ns, Inc.,* 435 U.S. 589, 599, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978) (citations omitted).

In *Lugosch,* the Second Circuit enumerated the steps that a court must take in exercising this discretion. First, a court must determine whether " 'the documents at issue are 'judicial documents' " to which the presumption of access attaches. *Lu-gosch,* 435 F.3d at 119 (quotation omitted). If so, the court must next determine the weight of the presumption of access. *Id.* " '[T]he weight to be given the presumption of access must be governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts.' " *Id.* (quoting *United States v. Amodeo,* 71 F.3d 1044, 1049 (2d Cir.1995) ("*Amodeo II* ")): *see also id.* at 1048 (explaining the importance of "professional and public monitoring" of the judiciary to its "democratic control" and concluding that "[s]uch monitoring is not possible without access to testimony and documents that are used in the performance of Article III functions").

As the Circuit explained, " '[g]enerally, the information will fall somewhere on a continuum from matters that directly affect an adjudication to matters that come within a court's purview solely to insure their irrelevance.' " *Id.* (quoting *Amodeo II,* 71 F.3d at 1049). For example, documents passed between the parties during the course of discovery are beyond the presumption's reach and "stand on a different footing than a motion filed by a party seeking action by the court, or, indeed, than any other document which is presented to the court to invoke its powers or affect its decisions." *Amodeo II,* 71 F.3d at 1050 (internal quotations, citations, and alterations omitted).

Finally, after determining the weight of the presumption of access, the court must "balance competing considerations against

---

**5.** Because I conclude that the common law right of access mandates disclosure of all of the information in the summary judgment papers at issue here, with one exception, I need not determine whether they are also subject to a First Amendment presumption of access, which the Second Circuit has characterized as "more stringent" than the common law. *Lugosch,* 435 F.3d at 124; *see also King*

*Pharm., Inc. v. Eon Labs, Inc.,* No. 04 Civ. 5540(DGT)(RLM), 2010 WL 3924689, at *4 n. 5 (E.D.N.Y. Sept. 28, 2010) (citations omitted) (noting that the First Amendment "demands broader disclosure than the common law" and declining to reach First Amendment right of access where common law required public disclosure).

it." *Lugosch*, 435 F.3d at 120 (quotations and citation omitted). "Such countervailing factors include but are not limited to 'the danger of impairing law enforcement or judicial efficiency' and the privacy interests of those resisting disclosure." *Id.* (quotations and citation omitted). I will consider each of these factors in turn.

### 2. Law Enforcement Concerns and Judicial Efficiency

■ The Circuit has observed that since law enforcement officials may be heavily-reliant on the voluntary cooperation of persons who may want or need confidentiality, "[i]f that confidentiality cannot be assured, cooperation will not be forthcoming." *Amodeo II*, 71 F.3d at 1050. "Although courts have compulsory process available to compel the giving of evidence or the production of documents, cooperation is also often essential to judicial efficiency. If release [of information] is likely to cause persons in the particular or future cases to resist involvement where cooperation is desirable, that effect should be weighed against the presumption of access." *Id.* (citations omitted); *cf. In re City of New York*, 607 F.3d 923, 941 (2d Cir.2010) (citations omitted) (purpose of the law enforcement privilege is, among other things, "to preserve the confidentiality of sources, to protect witness and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation").

### 3. Privacy Interests of Third Parties

As for privacy interests, the Circuit has "held that the privacy interests of innocent third parties should weigh heavily in a court's balancing equation. Such interests, while not always fitting comfortably under the rubric 'privacy,' are a venerable common law exception to the presumption of access." *Amodeo II*, 71 F.3d at 1050–51 (internal citations, quotations and altera-

tions omitted). In *Amodeo II*, the Circuit set forth the steps a court should take to determine the weight to be accorded to such privacy interests. First, a court should "consider the degree to which the subject matter is traditionally considered private rather than public. Financial records of a wholly owned business, family affairs, illnesses, embarrassing conduct with no public ramifications, and similar matters will weigh more heavily against access than conduct affecting a substantial portion of the public." *Id.* at 1051. Second, a court should consider "[t]he nature and degree of injury.... This will entail consideration not only of the sensitivity of the information and the subject but also of how the person seeking access intends to use the information." *Id.; see also Joy*, 692 F.2d at 893 ("The importance of the material to the adjudication, the damage disclosure might cause, and the public interest in such materials should be taken into account before a seal is imposed."). Finally, a court should consider the reliability of the information. *Id.* "Raw, unverified information should not be as readily disclosed as matters that are verified. Similarly, a court may consider whether the nature of the materials is such that there is a fair opportunity for the subject to respond to any accusations contained therein." *Id.*

### B. Application of the Standard
#### 1. Weight of the Presumption of Access

As a threshold matter, there is no question that the summary judgment filings at issue here constitute judicial documents to which the presumption of public access applies. The Circuit has stressed that "summary judgment is an adjudication, and '[a]n adjudication is a formal act of government, the basis of which should, absent exceptional circumstances, be subject to public scrutiny.'" *Lugosch*, 435

F.3d at 121 (quoting *Joy*, 692 F.2d at 893). Moreover, as to the weight of the presumption given to such summary judgment filings, the Circuit has emphasized "that the presumption is of the highest: 'documents used by parties moving for, or opposing, summary judgment should not remain under seal absent the most compelling reasons.'" *Lugosch*, 435 F.3d at 123 (quoting *Joy v. North*, 692 F.2d 880, 893 (2d Cir.1982)); *see also Gambale v. Deutsche Bank AG*, 377 F.3d 133, 140 (2d Cir.2004) ("[T]he presumptive right to 'public observation' is at its apogee when asserted with respect to documents relating to 'matters that directly affect an adjudication.'" (quoting *Amodeo II*, 71 F.3d at 1049)).

Though JPMC concedes that the presumption of access attaches to each of the categories of information in the summary judgment papers it seeks to seal, it nevertheless contends that the weight of this presumption is low. Def.'s Mem. at 6. Relying on dicta in *Amodeo II*, JPMC assesses the weight of the presumption for each of the categories of information it seeks to seal separately and according to the value it believes each piece of information will play in the adjudicatory process. *See, e.g.*, Def.'s Mem. at 9 ("The data which JPMC seeks to withhold ... carries a very low presumption of access insofar as the specific identity of these individuals is of "negligible" value to the adjudication of this motion.") (quoting *Amodeo II*, 71 F.3d at 1050); *id.* at 12 ("Given that the redacted data is limited to the names of the particular individuals interviewed, the strength of the presumption of access is once again very low for this category of information. The names of the individuals who were interviewed are not germane to the adjudication of this motion."); *id.* at 14 ("The names are of negligible adjudicatory value."). JPMC thus appears to contend that the weight of the presumption that attaches to a piece of information submitted in connection with a motion for summary judgment depends upon whether that piece of information is particularly germane to the merits of the motion or is one upon which the case will turn.

This is an approach that was considered and rejected in *Lugosch*, where the Circuit concluded that it was improper for the district court "to suggest that different types of documents might receive different weights of presumption based on the extent to which they were relied upon in resolving the motion." 435 F.3d at 123; *see also Sony Ericsson Mobile Commc'ns AB v. Delta Elecs. Co. Ltd.*, No. 09 Civ. 995(BSJ), 2009 WL 959639, at *2 (S.D.N.Y. Apr. 8, 2009) (where party intended that documents be taken into account by court by submitting them as part of its motion papers, the documents were entitled to equal weight of presumption of access); *In re NBC Universal, Inc.*, 426 F.Supp.2d 49, 54 (E.D.N.Y.2006) ("[I]t appears that *Lugosch* adopted a scheme of applying varying weights of presumption to types of motions or practices, not to particular documents filed in support of those motions."); *United States v. Sattar*, 471 F.Supp.2d 380, 386 (S.D.N.Y.2006) ("After *Lugosch*, it appears that the test focuses not on whether the document was actually used by the court but, rather, on the role the document was intended to play in the exercise of the court's Article III duties. If a party submitted the document as part of the process of adjudication, the presumption of public access accorded the document is entitled to great weight.").

Any approach in which the weight of the presumption accorded to a particular piece of information depends on the disposition of a particular claim, the Circuit observed, "'would require the Court to review the documents under varying standards, which would be extremely difficult and a waste of judicial resources.'" *Lugosch*, 435 F.3d at

123 (quoting *Diversified Grp., Inc. v. Daugerdas,* 217 F.R.D. 152, 159 n. 5 (S.D.N.Y. 2003)). Additionally, JPMC's reliance on *Amodeo II* in support of this approach is ill-founded as that case did not involve submissions made by the parties in the context of summary judgment—an adjudication—a distinction that makes all the difference. *See Lugosch,* 435 F.3d at 121 (concluding that "[n]othing in either *Amodeo* case changes th[e] conclusion" that " 'documents used by parties moving for, or opposing, summary judgment should not remain under seal absent the most compelling reasons' " (quoting *Joy,* 692 F.2d at 893)); *see also Cedar Swamp Holdings, Inc. v. Zaman,* 476 F.Supp.2d 303, 304 (S.D.N.Y.2007) ("[T]he presumption is at its strongest when the document in question ... has been submitted as a basis for judicial decision making." (citation and internal quotation marks omitted)).

I thus reject JPMC's approach and conclude that the weight to be accorded the presumption of public access to each of the pieces of information in the summary judgment filings that JPMC seeks to seal "is of the highest." *Lugosch,* 435 F.3d at 123. JPMC faces a heavy burden in establishing that any countervailing factors—here, primarily the privacy and confidentiality interests of various JPMC present or former employees—rebut this presumption. I assess the weight of these interests and balance them against the presumption of access with respect to each of the identified categories in turn below.

### 2. Names of JPMC Employees Whose Conduct JPMC Investigated in Connection with Lytle's Allegations

JPMC first seeks to redact the names of the individuals whose conduct JPMC investigated in response to Lytle's complaints regarding alleged harassment and discrimination during his time at JPMC. Def.'s Mem. at 8. JPMC reviewed allegations by Lytle that one of his former managers, who remains a JPMC employee, referred to a group of predominantly African–American and Latino employees as "monkeys needing to learn new tricks" and also allegedly referred to another individual as a "f___ing dot head." Def.'s Mem. at 8. The manager stated that he recalled using the word "monkey" at the meeting in question but denied using it in the manner alleged by Lytle. Defendant's Rule 56.1 Statement ¶ 54 ("Def.'s 56.1 Statement") (Dkt. No. 52). He denied making the other statement. *Id.* ¶ 57. After conducting an investigation into Lytle's allegations, JPMC issued the manager a written warning that included language that his failure to show immediate and sustained improvement could result in additional corrective action, including his termination. *Id.* ¶ 56.

JPMC also reviewed allegations by Lytle that another of Lytle's former managers allegedly used the phrase "fire that nigga" at JPMC. Def.'s Mem. at 9. After investigating the claim and determining that the employee had used "inappropriate language" in the workplace, the manager was terminated. Def.'s 56.1 Statement ¶¶ 59, 60. Finally, JPMC investigated the conduct of two additional employees who participated in a conversation with this manager. *Id.* ¶ 61. After conducting an investigation, JPMC issued written reprimands to these employees "for failing to maintain JPMC's standards of professional decorum." *Id.*

JPMC asserts that the privacy interests of these individuals are strong and well recognized and that "nonparty employees have a privacy interest in maintaining the confidentiality of information which potentially reflects adversely on their employment history—such as employment termination, other disciplinary actions, allegations of improper conduct, and investigations of alleged improper

conduct." Def.'s Mem. at 9–10. Yet JPMC provides the Court with no authority involving a factual scenario similar to the one here that supports this assertion, and JPMC conceded as much during oral argument. Tr. 19:11–20:7; 29: 4–23. Nor does JPMC provide the Court with any authority that supports the proposition that the identities of those who have been subject to an internal investigation by an employer are "traditionally considered private" under *Amodeo II*—the first step in a court's determination of the weight to be accorded to any purported privacy interest implicated by the availability of this information to the public.

In *In re Savitt/Adler Litigation*, No. 95 Civ. 1842(RSP)(DRH), 1997 WL 797511 (N.D.N.Y. Dec. 23, 1997), a case JPMC relies on, the court considered, among other things, whether the identities of non-party Assistant Attorneys General ("AAGs") could be redacted from a portion of a summary judgment filing in a case involving two former AAGs who claimed that a Republican Attorney General had discriminated against them because of their lack of connection to the Republican party or office holders. The portion of the filing from which the defendant in that case sought to redact the identifying information included "resumes, evaluations, and letters or memoranda recommending a particular candidate's hiring or rehiring." *Id.* at *2. The court allowed the redaction of the identifying information of the non-party AAGs, reasoning that this information was traditionally considered private under *Amodeo II* because "New York exempts the employment histories of public employees and the references of applicants from disclosure under the Freedom of Information Law," [and] "some of the information could be damaging to the non-party AAGs and was unsworn." *Id.* at *3. Accordingly, the court concluded that these interests were sufficient to overcome the presumption of access to the information. *Id.*

There is no such basis—statutory or otherwise—to conclude that the information JPMC seeks to keep out of the public record here is traditionally considered private. Indeed, one of the key underpinnings of the court's rationale in *In re Savitt/Adler*—which was decided well before *Lugosch* was that the information that the non-party AAGs sought to shield was protected from disclosure by statute; there is no such statute at issue here. While JPMC contends that as a matter of corporate policy JPMC maintains all personnel data, including disciplinary and other adverse employment actions in confidence—a common corporate best practice to be sure—this fact does not render the information traditionally considered private under *Amodeo II*. If that were the case, then every private employer accused of employment discrimination in federal court would presumably seek to have the names of any involved non-party employees redacted from its court filings.[6]

As for the next steps outlined in *Amodeo II* in determining the weight to afford the privacy interests at stake here—the nature and degree of injury and the reliability of the information—JPMC argues that public disclosure of the information at issue could have a harmful impact on the career prospects of the affected individuals and could also, for example, create tensions in the workplace and undermine

---

**6.** Notably, JPMC litigated another race discrimination case in this District a few years ago in which one of its vice-presidents was found to have engaged in "offensive" conduct and was identified by name in the court's decision. There is nothing in the record there to indicate that JPMC filed any of its motion papers under seal or sought to redact the name of its supervisor. *See Kennedy v. JP Morgan Chase & Co.*, 325 F.Supp.2d 401, 409 (S.D.N.Y.2004).

workplace efficiency and morale. Def.'s Mem. at 10–11. JPMC also contends that because "it did not verify the allegations as asserted by Lytle[,] ... Lytle's allegations remain 'raw' and 'unverified' insofar as there is no evidence that these individuals were motivated by racial or ethnic bias or routinely used offensive language in the workplace." Def.'s Mem. at 11.

While the conduct at issue may be potentially embarrassing to these employees (and JPMC) and may negatively impact their career prospects, any injury the employees may suffer by release of the information is insufficient to rebut the strong presumption of access to the information at issue here. This is particularly so because, as JPMC concedes, Lytle's complaint and attached exhibits already name each of the parties whose conduct JPMC investigated. Thus, their names are already in the public record, and have been for several years. JPMC provides no evidence that this information has injured the employees' career prospects in any way. Def.'s Mem. at 11 n. 4.[7] Next, contrary to JPMC's assertion, Lytle's allegations are neither "raw" nor "unverified." Just the opposite; JPMC investigated Lytle's allegations and consequently took disciplinary actions against the involved employees that resulted in the termination of one of the employees and the formal reprimand of two others. Def.'s 56.1 Statement ¶¶ 56, 60–61.

Finally, each of the cases that JPMC cites in support of its position is inapposite,

*Kelly v. City of New York*, No. 01 Civ. 8906(AGS)(DF), 2003 WL 548400 (S.D.N.Y. Feb. 24, 2003) relies heavily on *In re Savitt/Adler*, which I have already distinguished above, in reaching its conclusion, and also predates *Lugosch. Little v. Mitsubishi Motor Manufacturing of America, Inc.*, No. 04 Civ. 1034, 2006 WL 1554317 (CD.Ill. June 5, 2006), and *Mitchell v. Metropolitan Life Insurance Co.*, No. 03 Civ. 10294(WHP), 2004 WL 2439704 (S.D.N.Y. Nov. 2, 2004), both involve motions for protective orders pursuant to Fed.R.Civ.P. 26(c) and thus a different legal standard—one of "good cause"—than that presented here. Similarly, *U.S. Equal Employment Opportunity Commission v. ABM Industries Inc.*, No. 07 Civ. 01428(LJO)(JLT), 2010 WL 1267346 (E.D.Cal. Mar. 31, 2010) also involved a discovery issue—a motion to compel—and not a motion to seal.[8] Though *Caxton International Limited v. Reserve International Liquidity Fund, Ltd.*, No. 09 Civ. 782(PGG), 2009 WL 2365246 (S.D.N.Y. July 30, 2009) did involve a motion to seal, and the court there ultimately allowed redaction of the identities of the non-party investors in the fund at issue in the litigation, the court did so because "[i]n similar circumstances," *i.e.*, in cases involving non-party investors in certain funds or non-party customers of a business, "courts in this District have allowed parties to file under seal documents containing such identifying information." *Id.* at *6 (citing *Prof'l Sound Servs., Inc.*, No. 02 Civ.

---

7. JPMC contends that the "anonymity of the [involved] individuals is relatively well protected in Lytle's pleadings" because the narrative in these pleadings is "confused and disorganized." Def.'s Mem. at 11 n. 4. I disagree. Lytle's complaint is sufficiently clear for any one cursorily reviewing it to determine the gist of Lytle's allegations and the identities of the individuals involved.

8. "The 'good cause' analysis is informed by the presumptions of public access under the common law and the First Amendment[,]" *In re Parmalat Sec. Litig.*, 258 F.R.D. 236, 243 (S.D.N.Y.2009), and cases interpreting Fed. R.Civ.P. 26(c) often discuss presumption of public access. *See, e.g., id.; King*, 2010 WL 3924689, at *3; *Nycomed*, 2010 WL 889799, at *6. But since these cases do not discuss the prevailing Second Circuit authority regarding the presumption, their usefulness is limited.

8428(DC), 2003 WL 22097500, at *1 (S.D.N.Y. Sept. 10, 2003); *Druck Corp. v. The Macro Fund (U.S.) Ltd.*, No. 02 Civ. 6164(AGS)(DFE), 2002 WL 31415699, at *1 (S.D.N.Y. Oct. 28, 2002)). JPMC has identified no such similar circumstances here.

I conclude that the privacy interests at issue here are relatively weak and are insufficient to overcome the very strong presumption of access that has attached to the information submitted in connection with the summary judgment motion. Accordingly, the names of the four employees whose conduct JPMC investigated in connection with Lytle's allegations shall not remain sealed.

### 3. Names of Those Who Assisted JPMC in its Investigation

■ JPMC next seeks to redact the names of the JPMC employees and independent contractors who were interviewed in confidence as part of JPMC's investigation of Lytle's allegations. Def.'s Mem. at 12–13. As part of the investigation, "all of the individuals interviewed were advised that JPMC would not publicly disclose their identities and would maintain their confidentiality to *the extent possible.*" McKee Aff. ¶ 11 (emphasis added). JPMC asserts that the "confidentiality interests protecting persons who assist investigations of potential wrongdoing" are an important countervailing factor to the presumption of access and that "courts are mindful that without an expectation of confidentiality, individuals may be afraid to come forward with relevant information because they fear retaliation, accusations of disloyalty and other such consequences if their assistance should become known." Def.'s Mem. at 7. JPMC stresses, moreover, that failing to protect the identities of persons who have provided information "would subject them to awkward and potentially embarrassing situations in the workplace, as well as potential reprisals

from the people who were the subject of the investigation[,]" which would, in turn, diminish the reliability of JPMC's investigations and ultimately hinder its ability to take action against allegations of harassment and discrimination in the workplace. Def.'s Mem. at 13.

Yet the Circuit has only recognized such confidentiality interests as a countervailing factor in the context of investigations conducted by law enforcement officials—not those of corporations investigating allegations of employee misconduct. *See Lugosch*, 435 F.3d at 120 ("Such countervailing factors include but are not limited to 'the danger of impairing law enforcement or judicial efficiency.'" (quoting *Amodeo II*, 71 F.3d at 1050)); *Amodeo I*, 44 F.3d at 147 (law enforcement privilege that, among other things, preserves confidentiality of sources is an interest "'worthy of protection" in determination of whether to grant access to judicial documents"). Perhaps this is why JPMC has failed to cite a single case in which a court recognized the confidentiality interests of employees who cooperated in an employer investigation of employee behavior. Further, *Cohane v. National Collegiate Athletic Association*, Nos. 04 Civ. 181S (SR), 04 Civ. 0943S (SR), 2008 WL 3286396 (W.D.N.Y. Aug. 7, 2008), the one case that JPMC does cite in support of its position, is both legally and factually distinguishable from the situation presented here as it involved a motion for a protective order pursuant to Fed.R.Civ.P. 26(c) and, more importantly, did not involve "judicial documents'" to which the presumption of public access applies but instead documents exchanged by the parties during discovery. Such documents "play no role in the performance of Article III functions, …, lie entirely beyond the presumption's reach, and stand on a different footing than a motion filed by a party seeking action by the court." *Amodeo II*, 71 F.3d at 1050

(internal citations, quotations, and alterations omitted). Thus, *Cohane* did not involve a scenario such as the one here—where the presumption of access is "of the highest." *Lugosch*, 435 F.3d at 123.

Though I am sensitive to JPMC's concern for the expectations of confidentiality that the employees and independent contractors whom JPMC interviewed as part of its investigation of Lytle's allegations may have had, JPMC has provided me with no authority in which these or similar interests have been recognized as countervailing factors sufficient to overcome the strong presumption of public access that attaches to summary judgment filings.[9] In addition, JPMC has acknowledged that it advised the individuals interviewed that it would maintain confidentiality "to the extent possible," thus conceding that there was no unequivocal commitment to confidentiality. Finally, JPMC offers that "there is a risk that the information could filter back to the JPMC workplace," with resulting embarrassment and disruption, and have a "chilling effect" on other employees' willingness to come forward in future investigations. McKee Aff. ¶¶ 15, 16. But these generalized assertions are wholly speculative, and insufficient to overcome the presumption of public access. *See, e.g., Welsh v. City & Cnty. of S.F.*, 887 F.Supp. 1293, 1300 (N.D.Cal.1995) (disclosure to public of tapes and transcripts of witnesses interviewed during police com-

mission's investigation of sexual harassment charges against police chief would not have chilling effect on disclosures by future witnesses in investigations and employer not entitled to protective order).

Accordingly, the names of the JPMC employees and independent contractors who were interviewed as part of JPMC's investigation of Lytle's allegations shall not remain sealed.

### 4. Information Regarding Those Who Failed to Affirm the Code of Conduct

■ As part of its summary judgment filing, JPMC submitted copies of a number of emails that JPMC sent to employees—including Lytle—who missed the deadline for affirming JPMC's Code.[10] JPMC seeks to prevent disclosure of the identities of all of those employees except Lytle who failed to affirm the Code by a specific date, contending that the privacy interests of these individuals outweigh the presumption of access to the information. Specifically, JPMC contends that "disclosure of the fact that these JPMC employees had not affirmed the Code of Conduct could subject these individuals to embarrassment and stress as well as potentially have an adverse impact on their employment at JPMC." Def.'s Mem. at 14–15. If the emails are taken out of context, JPMC argues, they could give rise to the false impression that these individuals never af-

---

**9.** Like the names of the parties whose conduct JPMC investigated, the names of some of *the individuals whom JPMC interviewed as* part of its investigation are also contained in Lytle's publicly filed complaint and attached exhibits. JPMC provides no evidence that this publicly available information has subjected these employees to any awkwardness or embarrassment, let alone reprisals from any of the employees who were the subject of the investigation.

**10.** JPMC requires every employee to "affirm, either in writing or electronically, that the

employee has read and understood the Code and that the employee will comply with it." *Def's. 56.1 Statement* ¶ 76 *(citations omitted)*. JPMC employees were also required to reaffirm their understanding of and compliance with the Code on an annual basis or at other times when changes are made to the Code. *Id.* ¶ 77. Affirmation of the Code is a mandatory term and condition of employment at JPMC. *Id.* ¶ 78. JPMC contends that Lytle's refusal to affirm the Code ultimately led to his termination. *Id.* ¶¶ 86–91.

firmed the Code of Conduct, which, except for those who were scheduled to leave JPMC or who were on leaves of absence, all of them eventually did. Def.'s Mem. at 15. Further, JPMC contends that since these individuals are not parties to this action, they will have no meaningful opportunity to refute any allegations, "which may misinterpret their failure to timely affirm the Code of Conduct." Def.'s Mem. at 14.

JPMC's application to maintain the identities of these individuals under seal is denied. As an initial matter, this case is unlike those in which the privacy interests of individuals were held sufficient to overcome the presumption of access. The subject matter of the information here is not one "traditionally considered private rather than public." *Amodeo II*, 71 F.3d at 1051. JPMC does not assert that to be the case, and I have found no case in which a court has reached a similar conclusion under a factual scenario similar to this one. Indeed, most of the cases in which courts have concluded that the privacy interests of individuals were sufficient to overcome the presumption of access involve illness or sensitive personal financial information. *See, e.g., Jackson v. City of New York*, No. 06 Civ. 1835(RRM)(MDG), 2011 WL 1533471, at *9 n. 5 (E.D.N.Y. Mar. 3, 2011) (sealing medical records and names of officers who plaintiff alleged were similarly situated to her vis-a-vis medical disability); *Prescient Acquisition Grp., Inc. v. MJ Publ'g Trust*, 487 F.Supp.2d 374, 375 (S.D.N.Y.2007) (sealing permitted of two bank checks that would otherwise reveal "details of the manner in which [the pop star Michael] Jackson conduct[ed] his personal banking activities"); *Roberts v. Lederman*, No. 04 Civ. 00033(NGG), 2004 WL 2238564, at *7 (E.D.N.Y. Oct. 4, 2004) (sealing permitted where "the nature of much of the information in question is traditionally private as it involves illness and private conduct between" dying Beatle

George Harrison and his physician); *Doe v. Apfel*, No. 98 Civ. 182(JG), 1999 WL 182669, at *3 (E.D.N.Y. Mar. 22, 1999) (sealing permitted where "almost every document in the record contain[ed] a lengthy, detailed, and potentially embarrassing description of the illnesses from which Doe suffer[ed]").

I am also unpersuaded by JPMC's argument that the emails at issue here may subject these JPMC employees to embarrassment or potentially have an adverse impact on their employment at JPMC. JPMC's summary judgment papers make clear that all of the individuals, except for Lytle and nine other employees who were either on a leave of absence or scheduled to depart the company, eventually affirmed the Code. *See* Def's. 56.1 Statement ¶¶ 83–84; Affidavit of Magaly Denis–Roman in Support of Motion for Summary Judgment dated April 20, 2011, ¶ 19 ("I am not aware of any employees of JPMC who refused to affirm the Code and remained employed by the company.") (Dkt. No. 47); Memorandum of Law in Support of Defendant's Motion for Summary Judgment, dated April 21, 2011 at 18 ("By August of 2007, Lytle was one of only ten people left among more than 14,000 in his goupr [sic] who had yet to affirm the Code—and the other nine non-compliant employees were either on leaves of absence or were already scheduled to depart from the company.") (Dkt. No. 51).

Finally, JPMC misconstrues the final factor that the Circuit in *Amodeo II* suggested a court may consider in determining the weight of the privacy interests at stake. The Circuit stated that "a court may consider whether the nature of the materials is such that there is a fair opportunity for the subject to respond to any accusations contained therein." *Amodeo II*, 71 F.3d at 1051. There are no "accusations" in the emails containing the identi-

ties of the individuals that JPMC seeks to shield from the public. Further, any allegation from Plaintiff that may "misinterpret" the employees' failure to timely affirm the Code is rebutted by JPMC's statements on behalf of the employees that all of the individuals, except for Lytle and nine other employees, were either on a leave of absence or scheduled to depart the company, and eventually affirmed the Code.

Weighing the third parties' relatively weak privacy interests against the very strong presumption of public access, I conclude that there is no need for the continued sealing of the identities of all of those employees except Lytle who failed to affirm the Code.[11]

### 5. Internal JPMC Email Address and URL

■ The next category of information that JPMC seeks to maintain under seal is a link to an internal URL address at JPMC contained in certain of the emails discussed in the previous section, along with a telephone number, which JPMC employees could call with any questions about the Code. Denis–Roman Aff. ¶¶ 33–34. JPMC contends that it "has a legitimate privacy interest in protecting this data from public disclosure, insofar as both the URL address and the telephone number are internal to JPMC and its employees and there is no rationale for making them available to the public at large." Def.'s Mem. at 16.

But this is not the test. In spite of the presumption of public access to judicial records, a court may deny access to records that are "sources of business information that might harm a litigant's competitive standing." *Nixon*, 435 U.S. at 598, 98 S.Ct. 1306 (citations omitted). The information JPMC seeks to shield from the public, however, does not fall into this category. Nor does it constitute anything akin to a trade secret or even confidential business information. And, even if it did, JPMC still fails to "make a particular and specific demonstration of fact showing that disclosure would result in an injury sufficiently serious to warrant protection; broad allegations of harm unsubstantiated by specific examples or articulated reasoning fail to satisfy the test." *In re Parmalat*, 258 F.R.D. at 244 (citing cases); *see also King Pharm.*, 2010 WL 3924689, at *7–8; *Nycomed US, Inc. v. Glenmark Generics, Inc.*, 2010 WL 889799, at *6 (E.D.N.Y. March 8, 2010) (conclusory assertion of confidentiality regarding information submitted to FDA by drug company and included as part of a judicial document insufficient to outweigh presumption of public access). JPMC cites no injury that it would suffer if this information is unsealed. In short. JPMC has failed to overcome the presumption of access that has attached to this information. It should thus be unsealed.[12]

### 6. Personal Data Pertaining to Plaintiff Bruce Lytle

■ JPMC also seeks to maintain under seal certain information pertaining to Lytle that appears on a JPMC "New Hire Information Form"—his social security

---

11. I inquired of JPMC's counsel at the May 13 hearing why these documents with this information needed to be part of the summary judgment record, and counsel appeared to agree that they might not be necessary. Tr. 25:14–26:3. In unsealing its summary judgment papers, JPMC may refile them and exclude any documents with these names should it choose to do so.

12. As with the Code of Conduct documents, when unsealing its summary judgment papers, JPMC may refile them and exclude any documents that list the internal URL address and related information should it choose to do so. Lytle does not object to this result. Tr. 38:15–39:1.

number, date of birth, home address, and contact information; his employment history, including the salary he earned in those previous positions; his marital status; the name and contact information of his wife; and the name of his hiring manager at JPMC.[13] JPMC contends that Lytle "could be expected to have a legitimate privacy interest" in this information and that "he may prefer to maintain [it] as confidential." Def.'s Mem. at 16. Lytle does not specifically address this issue in any of his submissions; instead, he appears to contend that all of the information in the various submissions should be unsealed. Pl.'s April 7, 2011 Letter, at 2–3; Pl.'s August 4, 2011 Letter at 2. At the May 13 hearing, Lytle said that he did not "have an issue" with the information in his JPMC "new hire form" being made public. Tr. 39:15–40:3.

Lytle's social security number (except its last four digits) and his date of birth (except its year) shall remain sealed pursuant to Rule 5.2(a) of Federal Rules of Civil Procedure.[14] However, as for his contact information—which has been listed on the docket sheet in this action for nearly three years—and his marital status, since JPMC has articulated no basis for the continued sealing of this information, and Lytle does not oppose its public disclosure, the information shall be included on the public record. The same rationale applies to the name of Lytle's hiring manager; JPMC has articulated no basis for the continued sealing of this information. It too should therefore be unsealed.

Lytle's employment and education history may arguably be traditionally considered private rather than public. *Compare Sterbens v. Sound Shore Med. Ctr.*, No. 01 Civ. 5980(SAS)(KNF), 2001 WL 1549228, at *3 (S.D.N.Y. Dec. 5, 2001) (personnel files containing health, financial, and personal data typically viewed as private and therefore subject to protective order preventing disclosure to public) *and Bolia v. Mercury Print Prods., Inc.*, No. 02 Civ. 6510T, 2004 WL 2526407, at *4 (W.D.N.Y. Oct. 28, 2004) (documents from personnel file of deponent sealed where deponent's privacy rights outweighed public right to access) *and Ashkinazi v. Sapir*, No. 02 Civ. 0002(RCC), 2004 WL 1698446, at *1 (S.D.N.Y. July 28, 2004) (salary information of nonparty employees ordered to be redacted), *with Duling v. Gristede's Operating Corp.*, 266 F.R.D. 66, 73–78 (S.D.N.Y.2010) (personnel files of named plaintiffs containing documents related to, among other things, employees' compensation, disciplinary history, medical conditions, financial accounts, background checks not shielded from public disclosure). But because JPMC does not contend that Lytle will suffer any injury if the information is made public, and because Lytle himself has not opposed the unsealing of this information, I conclude that any privacy interest that Lytle may have in protecting the information is outweighed by the presumption of access to it. Moreover, there does not appear to be anything in the file that would cause Lytle any embarrassment or harm. Thus, the only information to remain under seal is Lytle's

---

**13.** This information appears in Exhibit E to the Affidavit of Zoe Jasper in Support of Defendant's Motion for Summary Judgment ("Jasper Aff.") (Dkt. No. 50).

**14.** Rule 5.2(a) provides: "Unless the court orders otherwise, in an electronic or paper filing with the court that contains an individual's social-security number, taxpayer-identification number, or birth date, the name of an individual known to be a minor, or a financial-account number, a party or nonparty making the filing may include only: (1) the last four digits of the social-security number and taxpayer-identification number; (2) the year of the individual's birth; (3) the minor's initials; and (4) the last four digits of the financial-account number."

social security number (except its last four digits) and his date of birth (except its year), consistent with Fed.R.Civ.P. 5.2(a).

### 7. JPMC Employee Who Allegedly Received Disparate Treatment

■ The final category of information that JPMC seeks to maintain under seal is the identity of an employee who Lytle alleges received disparate treatment in connection with a work schedule modification. Def.'s Letter dated July 1, 2011 at 2. JPMC contends that "redaction of this individual's personal information is appropriate because it involves private details pertaining to the family life of this individual, who is not involved in this litigation." *Id.* JPMC cites to *Mr. and Mrs. B v. Board of Education of Syosset Central School District*, 35 F.Supp.2d 224 (E.D.N.Y.1998), a case ordering redaction of the names of parents, the plaintiffs in the case, and their autistic pre-school child along with other identifying information, "consistent with the family's privacy rights under state law." *Id.* at 228.

JPMC's argument is unavailing, and this information shall be made public as well. Unlike in *Mr. and Mrs. B,* there are no state privacy or confidentiality laws at issue here, and JPMC does not contend that there are. Further, the innocuous information at issue in this case is nothing like that at issue in *Mr. and Mrs. B,* which contained "personal information regarding children who need special [educational] services, . . . such as reports of meetings with families of pre-school children and analyses of the cost of various [special education] programs." *Id.* at 230. Instead, the information that JPMC seeks to seal from the public is merely that one of Lytle's colleagues requested and was granted an accommodation "because of childcare"—undoubtedly a common request, and one that is not particularly sensitive in nature.

### 8. Request to Redact May 13, 2011 Transcript

Finally, JPMC has requested, by letter dated August 1, 2011 to the Southern District Reporters, that certain redactions to the transcript of the official court proceeding held on May 13, 2011 be made, consistent with its prior requests for redactions discussed herein. In light of the Court's rulings in this decision, this request is denied, and the transcript will be publicly filed without redactions.

### III. CONCLUSION

For the foregoing reasons, JPMC's request for an order sealing certain records and information in its motion for summary judgment (and in Lytle's opposition papers) is denied, except for the personal data described in section II.B.6, *supra.*

Having now ruled that all documents in support of or in opposition to JPMC's motion shall be unsealed in their entirety (except for any documents that include Lytle's personal data), the Court will stay its ruling for 14 days in order to give JPMC the opportunity to appeal to Judge Batts pursuant to Rule 72(a) of the Federal Rules of Civil Procedure. Should JPMC not appeal this ruling, JPMC is directed to file an unredacted set of its motion papers on or before September 15, 2011, and the Court will direct the Clerk of the Court to file Lytle's opposition papers immediately thereafter. Should JPMC appeal, the Court will hold Lytle's opposition papers in chambers until Judge Batts has resolved the appeal.

**SO ORDERED.**